FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

14 MAR 22 P 12: 50

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. Richard V. Morrow, | §<br>§<br>§ | |
| COMMONWEALTH OF VIRGINIA<br>ex rel. Richard V. Morrow, | §<br>§<br>§ | Civil Action No. 1.14 cv 440<br>CMH /TRJ |
| vs. | §<br>§ | JURY TRIAL DEMAND |
| FREDERICKSBURG HOSPITALIST<br>GROUP, LLC, and Rupinder K. Sandhu,<br>Feroz Tamana, Mirza M. Baig, Imran<br>Ahmad, Faisal Almeflehi, Muhammad<br>Asif, Tokzhan Clay, Hammad Hafeez,<br>Moses Kear, Asif Mahmood, Ibrahim<br>Munkaila, Barbara Newberg, Roya Qaemi,<br>and Zarmina Yusufi (in their individual<br>capacities) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | FILED IN CAMERA<br>AND UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730<br><br>DO NOT ENTER INTO PACER<br><br>DO NOT PLACE IN PRESS BOX |

Defendants.

## COMPLAINT

1.     Fredericksburg Hospitalist Group, LLC ("FHG") is a 22-member group practice in Fredericksburg, Virginia focusing on internal medicine and family medicine hospitalist services. From approximately 2000 to the present, FHG has provided hospitalist services to Mary Washington Healthcare (formerly known as MediCorp Health System) and its two primary hospitals, 443-bed Mary Washington Hospital ("MWH") in Fredericksburg, VA and the 100-bed Stafford Hospital ("SH") in Stafford, Virginia.

2.     Mr. Richard V. Morrow began work as FHG's Chief Operating Officer and Administrator on August 20, 2013.   Mr. Morrow's responsibilities included overseeing all aspects of the FHG's business practices, including billing.  Prior to working at FHG, Mr. Morrow

had spent 40 years in health care administration, including the previous 19 years as a senior director of hospital-based physician services.

3.      Within a matter of days after arriving at FHG, Mr. Morrow became aware of a number of improper and illegal practices, including up-coding and over-coding, billing for services that were not medically necessary, falsification of key financial information and records, and efforts on the part of FHG's owner-members to underreport taxable income. These practices resulted in or caused the submission of false claims to the government.

4.      As described herein, all false claims and actions taken in support of the submission of those claims was undertaken knowingly and willfully by the Defendants. The bad behavior at FHG was endemic. Upon asking a recently-hired physician what coding and billing training she had received from FHG, the physician responded, "I was just told to always code the highest possible level for everything."

5.      With respect to FHG's billing and coding practices that resulted in false claims, such practices were followed without regard to (1) whether those services were actually provided as coded, (2) whether those services were medically necessary, and (3) whether the proper coding perquisites were followed. Internal data shows that FHG coded "the highest" level for a variety of hospitalist services to a degree that would be statistically impossible if the coding had been done honestly.

6.      In the furtherance of their scheme, FHG's members did not maintain appropriate coding training for its clinicians – the individuals responsible for actually coding the encounters for FHG's billing to the government payors. Nor was any other coding or billing training afforded other staff at FHG. FHG also lacked any kind of compliance program or any compliance standards relating to coding or ethics.

7.     Further, coding performed by FHG staff and physicians was not subject to any review. When Mr. Morrow brought his specific concerns about FHG's practices directly to FHG's senior management and board – including illegal and fraudulent government billing - he was rebuffed and ignored.

8.     Rather than following the proper procedures for submitting legitimate claims for payment or approval, FHG intentionally and knowingly subverted government regulations and requirements in order to get paid.

9.     Mr. Morrow, as Relator, seeks to recover damages and civil penalties arising from the Defendants' making or causing to be made false or fraudulent records, statements, and/or claims in connection with false or fraudulent claims for Medicare, Medicaid, and other federal and state monies to the United States and the Commonwealth of Virginia.

10.     Relator states that all allegations in this Complaint are based on evidence obtained directly by Relator independently and through his own labor and efforts. The information and evidence he has obtained or of which he has personal knowledge, and on which these allegations of violations of the False Claims Act are based, consist of documents, computer data, conversations with authorized agents and employees of the Defendant(s), and his own direct observation of manipulations of computer accounting data or other actions taken by such authorized agents and employees of the Defendant. Relator is therefore an original source and has direct and independent knowledge of the information herein within the meaning of the False Claims Act, 31 U.S.C. §§ 3730(e)(4)(B).

## I.     **PARTIES**

11.     Relator Richard V. Morrow is a citizen of the United States and resides in Richmond, Virginia. He has worked as a healthcare executive and administrator, primarily in

Virginia, since 1972. Mr. Morrow is board certified in Healthcare Management and is a Fellow of the American College of Healthcare Executives (FACHE). He is also a veteran of the U.S. Naval Reserve.

12.     On or about March 18, 2014, Relator provided to the United States Attorney and the Attorney General of Virginia a full disclosure of substantially all material facts, as required by the False Claims Act, ("FCA") 31 U.S.C. § 3730(b)(2), and the Virginia Fraud Against Taxpayers Act, ("VFATA") Va. Code § 8.01-216.1 *et. seq.*

13.     Defendant Fredericksburg Hospitalist Group is incorporated in Virginia and has its principal places of business at 1001 Sam Perry Boulevard, Fredericksburg, VA 22401 and 101 Hospital Center Boulevard, Stafford, VA, 22554. FHG was incorporated in, and has operated as a going concern since, February 24, 2000. From at least 2004 to the present, upon information and belief, FHG was engaged in a scheme to submit or cause to be submitted false claims to the government by engaging in a pattern of up-coding, falsification of financial information and records, and facilitating the underreporting of income by FHG and FHG's owners.

14.     Defendant Rupinder K. Sandhu, M.D. is FHG's current President and Medical Director. As an officer and shareholder of FHG, Dr. Sandhu planned and participated in the schemes to defraud the government as alleged herein. Dr. Sandu is a resident of the Commonwealth of Virginia.

15.     Defendant Feroz Tamana, M.D. is FHG's current Vice President. As an officer and shareholder of FHG, Dr. Tamana planned and participated in the schemes to defraud the government as alleged herein. Dr. Tamana is a resident of the Commonwealth of Virginia.

16.     Defendant Mirza M. Baig, M.D. is FHG's current Secretary and Treasurer. As an officer and shareholder of FHG, Dr. Baig planned and participated in the schemes to defraud the government as alleged herein. Dr. Baig is a resident of the Commonwealth of Virginia.

17.     Defendant Imran Ahmad, M.D. is a shareholder of FHG. Dr. Ahmad planned and participated in the schemes to defraud the government as alleged herein. Dr. Ahmad is a resident of the Commonwealth of Virginia.

18.     Defendant Faisal Almeflehi, M.D. is a shareholder of FHG. Dr. Almeflehi planned and participated in the schemes to defraud the government as alleged herein. Dr. Almeflehi is a resident of the Commonwealth of Virginia.

19.     Defendant Muhammad Asif, M.D. is a shareholder of FHG. Dr. Asif planned and participated in the schemes to defraud the government as alleged herein. Dr. Asif is a resident of the Commonwealth of Virginia.

20.     Defendant Tokzhan Clay, M.D. is a shareholder of FHG. Dr. Clay planned and participated in the schemes to defraud the government as alleged herein. Dr. Clay is a resident of the Commonwealth of Virginia.

21.     Defendant Hammad Hafeez, M.D. is a shareholder of FHG. Dr. Hafeez planned and participated in the schemes to defraud the government as alleged herein. Dr. Hafeez is a resident of the Commonwealth of Virginia.

22.     Defendant Moses Kear, M.D. is a shareholder of FHG. Dr. Kear planned and participated in the schemes to defraud the government as alleged herein. Dr. Kear is a resident of the Commonwealth of Virginia.

23.     Defendant Asif Mahmood, M.D. is a shareholder of FHG. Dr. Mahmood planned and participated in the schemes to defraud the government as alleged herein. Dr. Mahmood is a resident of the Commonwealth of Virginia.

24.     Defendant Ibrahim Munkaila, M.D. is a shareholder of FHG. Dr. Munkaila planned and participated in the schemes to defraud the government as alleged herein. Dr. Munkaila is a resident of the Commonwealth of Virginia.

25.     Defendant Barbara Newberg, M.D. is a shareholder of FHG. Dr. Newberg planned and participated in the schemes to defraud the government as alleged herein. Dr. Newberg is a resident of the Commonwealth of Virginia.

26.     Defendant Roya Qaemi, M.D. is a shareholder of FHG. Dr. Qaemi planned and participated in the schemes to defraud the government as alleged herein. Dr. Qaemi is a resident of the Commonwealth of Virginia.

27.     Defendant Zarmina Yusufi, M.D. is a shareholder of FHG. Dr. Yusufi planned and participated in the schemes to defraud the government as alleged herein. Dr. Yusufi is a resident of the Commonwealth of Virginia.

## II.     JURISDICTION AND VENUE

28.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. Supplemental jurisdiction for Count II arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

29.     At all times material to this Complaint Defendants regularly conducted substantial business within the Commonwealth of Virginia and maintained permanent employees and offices in Virginia. Defendants are thus subject to personal jurisdiction in Virginia.

30.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district and FHG has its headquarters and principal place of business in this district.

## III.    FACTS

### A. Medicare Billing

31.     Various provisions of the United States Code authorize payment of federally funded benefits by federal and state health care benefit programs.

32.     The Social Security Act, codified in Title 42 of the United States Code, authorizes the payment of certain benefits for medical treatment of persons who are qualified on the basis of age, disability, or affliction with end-stage renal disease. This health care benefit program is known as Medicare. Reimbursement of hospital costs or charges is governed by Part A of Medicare, 42 U.S.C. §§ 1395c through 1395i-5, and reimbursement of physicians' charges is subject to Part B, 42 U.S.C. §§ 1395j through 1395w-5. Funds to support these programs are appropriated from the United States Treasury as required pursuant to 42 U.S.C. § 1395w.

33.     Administered by the Veterans Health Administration, 38 U.S.C. § 7301, federally funded payment of health care benefits for qualified veterans is authorized by 38 U.S.C. §§ 1701, et seq. Specifically, medical services in non-VA facilities are authorized by 38 U.S.C. § 1703. See also 38 C.F.R. §§ 17.52 through 17.56. These services may include medical services to veterans as well as diagnostic services, payment for which may be arranged by contracts with fiscal intermediaries. 38 U.S.C. § 1703(b). Certain eligible family members of a veteran may

obtain medical care benefits to the same extent as provided by Tricare, subject essentially to Tricare regulations. 38 U.S.C. § 1781.

34.    Reimbursements for medical services provided by veterans is authorized by 38 U.S.C. § 1728 and 38 U.S.C. § 1729(c)(2). See also 38 C.F.R. § 17.56(a). Payment made in accordance with the statutes and regulations controlling VA benefits constitute payment in full and no additional charge may be imposed on the beneficiary. 38 C.F.R. § 17.56(d). The United States is entitled to recover funds reimbursed on behalf of a veteran for medical care when the veteran would be eligible for payment by a third party payer. 38 U.S.C. § 1729(a)(1); 38 C.F.R. § 17.101(a). Careful compliance in coordinating benefits for a veteran's medical care is necessary under 38 U.S.C. § 1729(e).

35.    Under the Medicaid provisions of the Social Security Act, States are authorized to create state health care benefit programs and obtain federal financial participation in those programs. 42 U.S.C. §§ 1396 through 1396w-5. See also 42 C.F.R. § 430.10. Medicaid is a joint federal-state program providing health care benefits primarily to the poor and disabled. Federal participation is largely limited to the provision of matching funds and enforcement of minimum administrative standards. Appropriations are made from the United States Treasury to support the Medicaid program. 42 U.S.C. § 1396. See generally 42 C.F.R. Parts 430, 431, and 433.

36.    Medical assistance available under Medicaid is defined by 42 U.S.C. § 1396d, See also 42 C.F.R. § 433.56. Subject to state regulations, vendors of medical services seeking reimbursement must use claim forms and standardized coding of medical services as required by state law.

37.     Medicaid and Medicare are subject to essentially the same anti-fraud and anti-kickback legislation. 42 U.S.C. §§ 1320a-7b(a)(6), (d)(1), and (f)(2). These restrictions forbid payment of illegal remuneration and imposition of excessive charges. Id. A provider or a physician engaging in prohibited activities that result in submission of claims for excessive charges or for unnecessary medical services may be excluded from participation in federally funded health care benefit programs, including Medicaid. 42 U.S.C. § 1320a-7.

38.     Specific types of medical services and supplies are covered under Medicare Part B. Benefits include physicians' services as well as incidental services and supplies commonly provided in the performance of physicians' services and also certain diagnostic services, 42 U.S.C. §§ 1395k(a), 1395x(q), 1395w-4(f)(4)(A) (physicians' reimbursable services), and 1395xx(a)(1). See generally 42 C.F.R. Parts 410, 411, 414, 415, and 422.

39.     Under Medicare Part B, a physician has two options for receiving payment for medical services to Medicare beneficiaries. A physician may take an assignment of the coverage from a qualified patient to obtain reimbursement under Medicare. 42 U.S.C. 1395u(h)(1); 42 U.S.C. § 1395u(i); 42 C.F.R. § 414.20. Physicians may become participating physicians and accept assignments under 42 U.S.C. § 1395u(h).

40.     Participating providers and physicians are required to follow billing, accounting, and documentation requirements imposed by regulations and the fiscal intermediary. 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.5. Alternatively, a physician may decline to accept assignment and obtain a fee schedule amount plus the beneficiary's coinsurance and any difference between the physician's charge and the fee schedule amount, up to 115 percent of said fee schedule amount. See, e.g., 42 U.S.C. § 1395w-4(g)(2)(C); 42 C.F.R. § 400.202. Physicians declining to become participating physicians may accept or decline assignment on a case-by-case basis.

41.     The Medicare statute controlling payments under Part B establishes the schedule for reimbursement of physicians' services. 42 U.S.C. § 1395w-4; 42 C.F.R. Part 414, subpart B; 42 C.F.R. Part 405, subpart E; 42 C.F.R. Part 415, subpart C. The relative values of the components making up a physician's services are defined in 42 U.S.C. § 1395w-4(c) and 42 C.F.R. § 414.22. Further, 42 U.S.C. § 1395w-4(b)(1) determines the payments for mental health care services.

42.     The Medicare statute requires the creation of regulations controlling the factors used to determine the level of payments for various physician services to Medicare beneficiaries. 42 U.S.C. § 1395u(b)(8); 42 U.S.C. § 1395w-4(c)(5); 42 C.F.R. Part 414. Providers and physicians bill services according to designated code numbers corresponding to the level of medical service provided. 42 C.F.R. §§ 405.512, 414.40, and 424.32(a)(2). A list of five-digit codes is contained in the American Medical Association's Current Procedural Terminology Manual (CPT Manual).

43.     Under the statutorily mandated regulatory system establishing five-digit billing codes for use in making Medicare claims for reimbursement, various codes and modifiers are used to designate the level of service provided. 42 U.S.C. § 1395w-4(c)(4). For instance, consistent with statutory definitions of the components of services, a "26 modifier" indicates that . a physician delivered solely professional as distinct from technical components of a test or procedure and did not perform and integrated or "global" service. Charges having a "26 modifier" are compensated at a lesser rate.

44.     Under Medicare Part B, providers of services to and physicians treating Medicare beneficiaries submit claims for reimbursement to a Medicare carrier or fiscal intermediary on forms numbered "CMS-1450" and "CMS-1500," respectively. 42 U.S.C. § 1395m(a); 42 U.S.C.

§ 1395w-4(g)(4)(A); 42 C.F.R. Part 424, subpart C; 42 C.F.R. §§ 424.5(a), 424.32. These forms require the provider of services or physician to provide an identification number, patient information, and the five-digit code identifying the services for which reimbursement is sought. Forms CMS-1450 and CMS-1500 list those services provided to a single patient and may include a number of codes for treatment, but each constitutes a single claim for reimbursement.

45.     Likewise, physicians or providers of VA benefits must complete a claim form to obtain reimbursement for covered services. This form is designated VA Form 10-583. 38 C.F.R. § 17.124.

## B. CPT Coding and Medicare Billing for Hospitalists

46.     Section 1862(a)(1)(A) of the Act, 42 U.S.C. §§ 1395y, states that "no payment may be made under Part A or Part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . ."

47.     The physician fee schedule is the basis for Medicare reimbursement for all physician services beginning in January 1992. 42 U.S.C. §§ 1395w-4(a)(1). Section 1848(c)(5) of the Act required the Secretary of HHS to develop a uniform coding system for all physician services. 42 U.S.C. §§ 1395w-4(c)(5). The American Medical Association's "Current Procedural Terminology" ("CPT") maintains a numeric coding system for physicians' services.

48.     In 1983, CMS adopted the CPT as part of Medicare Healthcare Common Procedure Coding System (HCPCS) and mandated the providers use HCPCS to report physician services to Medicare.

49.     CMS issues binding guidance to its carriers in the form of claims processing manuals and memoranda.

50.     Section 1833(e) of the Act requires that providers furnish "such information as may be necessary in order to determine the amounts due" to receive Medicare payment. 42 U.S.C. §§ 13951. Claims for services that lack sufficient documentation to show that care was provided at the level for which reimbursement is sought do not meet the requirements of Section 1833(e).

51.     Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes. The medical record chronologically documents the care of the patient and is an important element of contributing to high quality care.

52.     The medical record serves as the legal document to verify the care provided. *See* 42 C.F.R. § 482.24(c). Documentation is the source of accurate Medicare insurance claim review and payment.

53.     Under CMS requirements, the documentation of each patient encounter should include: (1) the reason for the encounter and relevant history, physical examination findings, and prior diagnostic test results; (2) the assessment, clinical impression, or diagnosis; (3) a plan for care; and, (4) the date and legible identity of the observer.

54.     CMS requires that the CPT codes reported on the health insurance claim or billing statement be supported by the documentation in the medical record.

55.     The HHS Office of Inspector General has found repeated problems with lack of documentation suggesting physician upcoding for hospitalist services. *See* Final Report of Improper Fiscal Year 2002 Medicare Fee-for-Service Payments (A-17-02-02202), from Janet Rehnquist, Inspector General, to Thomas Scully, Administrator, Centers for Medicare and Medicaid Services (Jan. 16, 2003), at 11, (for 76.3% of reviewed patient encounters coded as 99233 and 36.7% coded

as 99232, documentation did not support level of services coded, so services billed were not medically necessary); Final Report of Improper Fiscal Year 2001 Medicare Fee-for-Service Payments (A-17-02-02202), from Rehnquist to Scully (Feb. 15, 2002), at 12 (for 42% of reviewed patient encounters coded as 99233, documentation did not support level of services coded); Final Report of improper Fiscal Year 2000 Medicare Fee-for-Service Payments (A-17-02-02202), from Michael F. Mangaro, Acting Inspector General, to Michael McMullan, Acting Principal Deputy Administrator, Centers for Medicare and Medicaid Services (Feb. 5, 2002), at 12 (for 49% of reviewed patient encounters coded as 99233, documentation did not support level of services coded).

56.      CMS has determined that physician coding deficiencies have and continue to cost taxpayers tremendous amounts of money. *See* Centers for Medicare and Medicaid Services, Improper Medicare Fee-For-Service Payments Report — November 2007 Report (in 2007 alone, projecting improper payments of $200 million for undocumented patient encounters coded as 99233, $97 million for encounters coded as 99223, $79 million for encounters coded as 99232, $36 million for encounters coded as 99291, and $23 million for encounters coded as 99222).

57.      Hospitalists typically bill using CPT codes for patient E/M or "evaluation and management services."

58.      These include CPT 99221-99223 (initial hospital care services) and CPT 99231-99233 (subsequent hospital care). Each of these groups of codes has three levels, for low, moderate, and high complexity. Thus, CPT 99221 is a low complexity initial encounter; CPT 99222 is one of moderate complexity, and CPT 99223 is an initial encounter of high complexity.

59.     These codes also have an option to bill based on face-to-face patient time; 99221 – up to 30 min., 99222 – up to 50 min., 99223 – up to 70 min. If billing based on time, the physician is required to properly document the patient encounter to justify the billing amount and CPT code.

60.     Another common E/M hospitalist billing CPT code is for discharge day management, CPT 99238-99239. Unlike the other codes referenced herein, these codes have a time component – whether the time spent with the patient was up to 30 minutes or greater than 30 minutes – that controls reimbursement. Hospitalists are reimbursed more for the longer discharge.

61.     Hospitalists also typically bill for two other types of patient encounters: consults and observations.

62.     CMS has issued specific guidance to physicians for billing and documentation of evaluation and management services in a publication named the Claims Processing Manual, Pub. 100-04, Ch. 12, § 30.6. The Medicare Claims Processing Manual states that the Act's medical necessity requirement obligates physicians to bill at the lowest level of evaluation and management services that is warranted. Medicare Claims Processing Manual, § 30.6.1(A).

63.     Likewise, to bill the highest levels of evaluation and management codes, the services furnished must meet the definition of the code. Medicare Claims Processing Manual, § 30.6.1(D). Furthermore, the documentation prepared by the physician must justify the chosen level of service. The Manual states: "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a

lower level of service is warranted . . . Documentation should support the level of service reported." Medicare Claims Processing Manual, § 30.6.1(A).

64.     CMS has prescribed specific documentation requirements for physicians specifically related to coding: "Physicians . . . are required to use the 1995 and 1997 E/M documentation guidelines to document the medical record with the appropriate clinical information." Medicare Claims Processing Manual, § 30.6.1.1 (G).

65.     The 1997 publication, entitled "1997 Documentation Guidelines for Evaluation and Management Services," ("1997 E/M Guidelines") provides specific and detailed guidance for physicians coding evaluation and management services.

66.     Billing for each of the types of services at issue here — initial hospital care, subsequent hospital care, critical care, and discharge — involves an analysis of several key components, including patient history, patient examination, and medical decision-making. For discharge coding, time spent with the patient is the key factor.

67.     The 1997 E/M Guidelines make clear that non-discharge E/M coding at the highest level must be done only when appropriate. "Because the level of service is dependent on two or three key components, performance and documentation of one component (*i.e.*, examination) at the highest level does not necessarily mean that the encounter in its entirety qualifies for the highest level of E/M service." 1997 E/M Guidelines p. 4.

68.     Discharge coding guidelines are even starker. If the billing physician does not satisfy the temporal perquisite for the higher level of billing, only billing for the lower level of service is permissible.

69.     As described in detail below, Defendants have knowingly and intentionally submitted false claims to the government for payment or approval. Defendants' false claims

include the knowing and intentionally submission of up-coded or over-coded claims wherein FHG billed the government for the provision of medical care that was either not properly provided, not provided at all, or was not medically necessary, in order to obtain greater compensation from the government.

## C. Specific Coding Requirements: Inpatient Hospital Care, CPT 99218-99220

70. CPT codes 99218-99220 are the E/M codes for "Initial Observation Care," for new or established patients. These codes are intended to capture the first hospital inpatient encounter by the supervising physician or other qualified health care professional with the patient when designated as "observation status."

71. In order to bill for CPT 99218, a hospitalist must provide documentation of three elements: (1) Detailed History, (2) Detailed Exam, (3) Straightforward/low-complexity Medical Decision Making. According to the American Medical Association 2014 CPT code book ("AMA Guide"), work performed at this level requires the least amount of time spent with the patient: "Typically, **30 minutes** are spent at the bedside and on the patient's hospital floor or unit."

72. In order to bill for CPT 99219, a hospitalist must provide documentation of the following three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) Moderate complexity Medical Decision Making. According to the AMA Guide, work performed at this level requires a moderate amount of time spent with the patient: "Typically, **50 minutes** are spent at the bedside and on the patient's hospital floor or unit."

73. In order to bill for CPT 99220, a hospitalist must provide documentation of the following three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) High complexity Medical Decision Making. According to the AMA Guide, work performed at this

level requires the greatest amount of time spent with the patient: "Typically, **70 minutes** are spent at the bedside and on the patient's hospital floor or unit."

74.     "Detailed History," and "Comprehensive History," are defined terms that require specific criteria to be met. CMS defines documentation of a "Detailed History," to include: a Chief Complaint, a review of 4 out of 8 elements characterizing the History of Present Illness, a review of 2 to 9 bodily systems, and one relevant element of Past Medical, Family, and Social History.

75.     Comprehensive History is satisfied when documentation of a Chief Complaint, at least four elements of the patient's History of Present Illness, a review of 10 bodily systems, and a complete Past Medical, Family, and Social History is provided.

76.     Similarly, "Detailed Exam," and "Comprehensive Exam," have detailed, enumerated requirements that must be satisfied in full.  CMS defines documentation of a "Detailed Exam," to require *"Detailed Examination – should include at least six organ systems or body areas. For each system/area selected, performance and documentation of at least two elements identified by a bullet (•) is expected. Alternatively, a detailed examination may include performance and documentation of at least twelve elements identified by a bullet (•) in two or more organ systems or body areas."*

77.     The documentation of a "Comprehensive Exam," must include: *Comprehensive Examination – should include at least nine organ systems or body areas. For each system/area selected, all elements of the examination identified by a bullet (•) should be performed, unless specific directions limit the content of the examination. For each area/system, documentation of at least two elements identified by a bullet is expected.*

78.     Finally, documentation of Medical Decision Making relates to the complexity of establishing a diagnosis and/or selecting a management option. Relevant factors include the nature and number of clinical problems, the amount and complexity of the data reviewed, and the level of risk associated with the presenting problem, the required diagnostic procedures, and potential management options.

79.     For cases of complex Medical Decision Making, cases of "High Complexity," present with extensive diagnoses or management options, an extensive and complex amount of data to be reviewed, and high risk of complications and/or mortality.

80.     At present rates, CMS reimburses $94.90 for CPT 99218, 129.25 for CPT 99219, and 177.28 for CPT 99222.

81.     CMS data show that on average, 4.24% of inpatient initial observation services are billed at 99218, 28.39% are billed at 99219, and 67.35% are billed at 99220.

82.     FHG's internal coding data show that when FHG billed for these codes, however, .25% were for 99218, 17.56% were for 99219, and 82.19% were for 99220.

83.     From January 2012 through August of 2013, FHG billed 21 times using CPT 99218, 1457 times using CPT 99219, and 6820 times using CPT 99220.

84.     Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

85.     FHG physicians were told and trained to bill the government for CPT 99220, the highest possible procedure code, without regard to medical necessity.

**D. Specific Coding Requirements: Inpatient Hospital Care, CPT 99221-99223**

86.     CPT codes 99221-99223 are the E/M codes for "Initial Hospital Care," for new or established patients. These codes are intended to capture the first hospital inpatient encounter with the patient by the admitting physician.

87.     In order to bill for CPT 99221, a hospitalist must provide documentation of three elements: (1) Detailed History, (2) Detailed Exam, (3) Straightforward/low-complexity Medical Decision Making. According to the American Medical Association 2014 CPT code book ("AMA Guide"), work performed at this level requires the least amount of time spent with the patient: "Typically, **30 minutes** are spent at the bedside and on the patient's hospital floor or unit."

88.     In order to bill for CPT 99222, a hospitalist must provide documentation of the following three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) Moderate complexity Medical Decision Making. According to the AMA Guide, work performed at this level requires a moderate amount of time spent with the patient: "Typically, **50 minutes** are spent at the bedside and on the patient's hospital floor or unit."

89.     In order to bill for CPT 99223, a hospitalist must provide documentation of the following three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) High complexity Medical Decision Making. According to the AMA Guide, work performed at this level requires the greatest amount of time spent with the patient: "Typically, **70 minutes** are spent at the bedside and on the patient's hospital floor or unit."

90.     At present rates, CMS reimburses $97.06 for CPT 99221, $131.83 for CPT 99222, and $194.05 for CPT 99223.

91.     CMS data show that on average, 5% of inpatient hospital admissions are billed at 99221, 29% are billed at 99222, and 67% are billed at 99223.

92.     FHG's internal coding data show that when FHG billed for these codes, however, .2% were for 99221, 13% were for 99222, and 86.8% were for 99223.

93.     From January 2012 through August of 2013, FHG billed 43 times using CPT 99221, 2380 times using CPT 99222, and 15927 times using CPT 99223.

94.     Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

95.     FHG physicians were told and trained to bill the government for CPT 99223, the highest possible procedure code, without regard to medical necessity.

### E. Specific Coding Requirements: Subsequent Observation Care, CPT 99224-99226

96.     CPT codes 99224-99226 are the E/M codes for "Subsequent Observation Care," for new or established patients.  This coding relates to observation care provided on days other than the day of initial observation and the day of discharge.

97.     In order to bill for CPT 99224, a hospitalist must provide documentation of three elements: (1) Problem-Focused History, (2) Problem-Focused Exam, (3) Straightforward/low-Complexity Medical Decision Making.

98.     According to the AMA Guide, work performed at this level requires the least amount of time spent with the patient: "Usually, the patient is **stable, recovering, or improving.** Typically, **15 minutes** are spent at the bedside and on the patient's hospital floor or unit."

99.     In order to bill for CPT 99225, a hospitalist must provide documentation of three elements: (1) Expanded Problem-Focused History, (2) Expanded Problem-Focused Exam, (3) Moderate-Complexity Medical Decision Making.

100.    According to the AMA Guide, work performed at this level requires a moderate amount of time spent with the patient: "Usually, the patient is **responding inadequately** to

therapy or has developed a **minor complication**. Typically, **25 minutes** are spent at the bedside and on the patient's hospital floor or unit."

101.    In order to bill for CPT 99226, a hospitalist must provide documentation of three elements: (1) Detailed History, (2) Detailed Exam, (3) High-Complexity Medical Decision Making. According to the AMA Guide, work performed at this level requires the greatest amount of time spent with the patient: "Usually, the patient is **unstable** or has developed a **significant complication** or a **significant new problem**. Typically, **35 minutes** are spent at the bedside and on the patient's hospital floor or unit."

102.    At present rates, CMS reimburses $37.99 for CPT 99224, $68.98 for CPT 99225, and $99.70 for CPT 99226.

103.    CMS data show that on average, 15% of inpatient hospital admissions are billed at 99224, 62% are billed at 99225, and 23% are billed at 99226.

104.    FHG's internal coding data show that when FHG billed for these codes, however, 1.19% were for 99224, 22.71% were for 99225, and 76.10% were for 99226.

105.    From January 2012 through August of 2013, FHG billed 26 times using CPT 99224, 497 times using CPT 99225, and 1665 times using CPT 99226.

106.    Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

107.    FHG physicians were told and trained to bill the government for CPT 99226, the highest possible procedure code, without regard to medical necessity.

**F. Specific Coding Requirements: Inpatient Subsequent Visits, CPT 99231-99233**

108.    CPT codes 99231-99233 are the E/M codes for "Inpatient Hospital Care," for new or established patients. This coding relates to inpatient hospital care provided post-admission.

109.    In order to bill for CPT 99231, a hospitalist must provide documentation of three elements: (1) Problem-Focused History, (2) Problem-Focused Exam, (3) Straightforward/low-Complexity Medical Decision Making.

110.    According to the AMA Guide, work performed at this level requires the least amount of time spent with the patient: "Usually, the patient is **stable, recovering, or improving.** Typically, **15 minutes** are spent at the bedside and on the patient's hospital floor or unit."

111.    In order to bill for CPT 99232, a hospitalist must provide documentation of three elements: (1) Expanded Problem-Focused History, (2) Expanded Problem-Focused Exam, (3) Moderate-Complexity Medical Decision Making.

112.    According to the AMA Guide, work performed at this level requires a moderate amount of time spent with the patient: "Usually, the patient is **responding inadequately** to therapy or has developed a **minor complication.** Typically, **25 minutes** are spent at the bedside and on the patient's hospital floor or unit."

113.    In order to bill for CPT 99233, a hospitalist must provide documentation of three elements: (1) Detailed History, (2) Detailed Exam, (3) High-Complexity Medical Decision Making. According to the AMA Guide, work performed at this level requires the greatest amount of time spent with the patient: "Usually, the patient is **unstable** or has developed a **significant complication** or a **significant new problem.** Typically, **35 minutes** are spent at the bedside and on the patient's hospital floor or unit."

114.    At present rates, CMS reimburses $37.41 for CPT 99231, $68.89 for CPT 99232, and $99.28 for CPT 99233.

115.    CMS data show that on average, 10% of inpatient hospital admissions are billed at 99231, 61% are billed at 99232, and 29% are billed at 99233.

116.   FHG's internal coding data show that when FHG billed for these codes, however, .01% were for 99231, 25% were for 99232, and 74% were for 99233.

117.   From January 2012 through August of 2013, FHG billed 388 times using CPT 99231, 12483 times using CPT 99232, and 36624 times using CPT 99233.

118.   Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

119.   FHG physicians were told and trained to bill the government for CPT 99233, the highest possible procedure code, without regard to medical necessity.

## G. Specific Coding Requirements: Observation or Inpatient Care Services (Including Admission and Discharge Services), CPT 99234-99236

120.   CPT codes 99234-99236 are the E/M codes for "Observation or Inpatient Care Services (Including Admission and Discharge Services)," for new or established patients. This coding relates to observation or inpatient hospital care provided to patients seen and discharged on the same date of service.

121.   In order to bill for CPT 99234-99236 a hospitalist must provide documentation that the observation services were provided at discharge of the patient from "observation status," and further that the date of discharge is the same date as the initial date of such "observation status."

122.   In order to bill for CPT 99234, a hospitalist must provide documentation of three elements: (1) Detailed History, (2) Detailed Exam, (3) Straightforward/low-Complexity Medical Decision Making.

123.   According to the AMA Guide, work performed at this level requires the least amount of time spent with the patient: "Usually, the presenting problem(s) requiring admission

are of **low severity**. Typically, **40 minutes** are spent at the bedside and on the patient's hospital floor or unit."

124.     In order to bill for CPT 99235, a hospitalist must provide documentation of three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) Moderate-Complexity Medical Decision Making.

125.     According to the AMA Guide, work performed at this level requires a moderate amount of time spent with the patient: "Usually, the presenting problem(s) requiring admission are of **moderate severity**. Typically, **50 minutes** are spent at the bedside and on the patient's hospital floor or unit."

126.     In order to bill for CPT 99236, a hospitalist must provide documentation of three elements: (1) Comprehensive History, (2) Comprehensive Exam, (3) High-Complexity Medical Decision Making.  According to the AMA Guide, work performed at this level requires the greatest amount of time spent with the patient: "Usually, the presenting problem(s) requiring admission are of **high severity**.  Typically, **55 minutes** are spent at the bedside and on the patient's hospital floor or unit."

127.     At present rates, CMS reimburses $128.47 for CPT 99234, $161.25 for CPT 99235, and $208.28 for CPT 99236.

128.     Data show that on average, approximately 3.36% of inpatient observation or inpatient services at discharge are billed at 99234, 34.64% are billed at 99235, and 62% are billed at 99236.

129.     FHG's internal coding data show that when FHG billed for these codes, however, 1.32% were for 99234, 19.30% were for 99235, 79.39% were for 99236.

130. From January 2012 through August of 2013, FHG billed 6 times using CPT 99234, 88 times using CPT 99235, and 362 times using CPT 99236.

131. Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

132. FHG physicians were told and trained to bill the government for CPT 99236, the highest possible procedure code, without regard to medical necessity.

## H. Specific Coding Requirements: Hospital Discharge Day Management Services, CPT 99238-99239

133. Hospital Day Discharge Management Services allow hospitalists to bill Medicare for the physician time spent for the final discharge of a patient. Only the attending physician can bill under these codes – other non-attending physicians would bill under CPT 99231-99233 for Subsequent Hospital Care.

134. CPT codes 99238-99239 are the E/M codes for "Hospital Discharge Day Management Services," for new or established patients. The coding is meant to encompass the hospitalist's work in discharging her patient, including face-to-face time spent with the patient.

135. In order to bill for CPT 99238, a hospitalist must provide documentation of discharge work time **less than or equal to 30 minutes**.

136. In order to bill for CPT 99239, a hospitalist must provide documentation of discharge work time equal to or **more than 31 minutes**.

137. At present rates, CMS reimburses $69.56 for CPT 99238 and $102.95 for CPT 99239.

138. CMS data show that on average, 52% of inpatient hospital admissions are billed at 99238 and 48% are billed at 99239.

139. FHG's internal coding data show that when FHG billed for these codes, however, 5% were for 99238 and 95% were for 99239.

140. From January 2012 through August of 2013, FHG billed 868 times using CPT 99238 and 11907 times using CPT 99239.

141. Approximately 65% of FHG's claims for these CPT codes were made to Medicare and Medicaid.

142. FHG physicians were told and trained to bill the government for CPT 99239, the highest possible procedure code, without regard to medical necessity.

## I. Specific Coding Requirements: Hospitalist and Intensivist Billing For ICU Care

143. FHG patients often require care in the Mary Washington or Stafford Hospital ICU. Mary Washington Healthcare contracts with an intensivist physician group to serve as the primary providers of care for the Mary Washington Hospital and Stafford Hospital ICUs. Despite the presence of the contracted intensivist group physicians at both hospitals, FHG hospitalists are regularly scheduled by FHG to also cover FHG patients in the ICUs.

144. When two physicians from two different practices treat a patient in an ICU, Medicare only pays for that dual care when it is medically necessary and not duplicative. Prior to 2010, this small subset of permissible dual care in an ICU was accomplished by billing the government for a "consultation" in addition to the primary caregiver's CPT.

145. Beginning in 2010, CMS eliminated the codes for consultation, after concluding that the services provided during consults were not significantly different than those provided during initial or subsequent observation or hospital care, and that the requirements for billing under the consultation codes had proven ambiguous and unworkable. 74 Fed. Reg. 61738, 61775

(Nov. 25, 2009). Consequently, all consultation services, with the exception of those provided via telehealth technology, are now billed using the codes for equivalent E/M services. *Id.*

146. When a hospitalist and an intensivist "co-manage" patients in the ICU, billing for both physicians' services is only appropriate under limited conditions. For instance, the CMS Medicare Claims Processing Manual unequivocally states that where two physicians in the same group practice provide E/M services to the same patient on the same date, only one may bill for the service. Internet-Only Medicare Claims Processing Manual, Pub. 100-04 ("CPM"), chapter 12, § 30.6.5.

147. Similarly, where the same physician provides E/M services in two separate episodes for the same patient on the same date of service, CMS can be billed for only one E/M service for the day. *Id.* This is because the E/M initial and subsequent care codes are defined as "per diem" codes, meant to bundle up and bill for all E/M services of that type provided by a given provider on a given date of service to a given patient. CPM, chapter 12, § 30.6.9 A.

148. In addition, the CPM states that "[w]hen critical care services are provided on a date where an inpatient hospital or office/outpatient evaluation and management service was *furnished earlier on the same date* at which time the patient did not require critical care, both the critical care and the previous evaluation and management service may be paid." CPM, chapter 12, § 30.6.12 H (emphasis added). This implies that the opposite is not true, in other words, that when critical care services are provided prior to the provision of evaluation and management services, only the critical care services may be billed.

149. The CPM also states that "Medicare Part B under the physician fee schedule does not pay for ventilator management services in addition to an evaluation and management service (e.g., critical care services, CPT codes 99291 - 99292) on the same day for the patient even when

the evaluation and management service is billed with CPT modifier -25." CPM, chapter 12, § 30.6.12 N. Ventilator management is a common procedure performed by intensivists, as they are usually pulmonologists by specialty, as is the case with Mary Washington Healthcare. When an intensivist bills for ventilator management, no E/M service may be billed for the same patient on the same date of service. *Id.*

150.     "Concurrent care" is specifically defined in the CMS manuals to exist only "where more than one physician renders services more extensive than consultative services during a period of time. The reasonable and necessary services of each physician rendering concurrent care could be covered where each is required to play an active role in the patient's treatment, for example, because of the existence of more than one medical condition requiring diverse specialized medical services." Internet-Only Medicare Benefit Policy Manual ("BPM"), chapter 15, § 30.E.

151.     "Co-management" of the same patient with a medical condition that does not require more than one type of specialized medical care does not qualify as "concurrent care," and accordingly, may be billed for by only one of the two physicians. Further, concurrent care is only appropriately billed by both physicians as critical care where there is sufficient documentation to independently support critical care-level services from both physicians. *Id.*

152.     With respect to the level of services required in order to concurrently bill for critical care provided by two physicians, the CPM states that "[p]roviding medical care to a critically ill patient should not be automatically deemed to be a critical care service for the sole reason that the patient is critically ill or injured. While more than one physician may provide critical care services to a patient during the critical care episode of an illness or injury each

physician must be managing one or more critical illness(es) or injury(ies) in whole or in part." CPM, chapter 12, § 30.6.12 B.

153.    In addition, the CPM goes on to note that "[f]or any given period of time spent providing critical care services, the physician must devote his or her full attention to the patient and, therefore, cannot provide services to any other patient during the same period of time." CPM, chapter 12, § 30.6.12 C.

154.    FHG hospitalists bill for concurrent care with non-FHG intensivists of ICU patients in *all* cases, without regard to whether such ICU patients' medical condition requires such concurrent care, and in contravention of the basic requirement that services billed to Medicare must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member," or in other words, medically necessary. 42 U.S.C. § 1395y(a)(1)(A).

155.    In determining whether the individual services provided by each physician are reasonable and necessary, it must be kept in mind that "payment may not be made for any services rendered by either physician which, for that condition, exceed normal frequency or duration unless there are special circumstances requiring the additional care." CBM, chapter 15, § 30.E. In other words, routinely providing concurrent care as a matter of course to ICU patients cannot be justified unless *all* of the ICU patients' conditions either normally would require such concurrent care, or there are special circumstances in all ICU patients' cases, documented in their files, indicating that the concurrent care provided was in fact reasonable and necessary.

## J.   FHG's Billing and Coding Practices Were Solely Driven By Motivation To Obtain The Greatest Profits

156.     The doctors at FHG are all paid based upon FHG's revenue. For the owners of FHG, the more revenue, the more potential profit. Non-owner physicians are paid salary, but their opportunity for advancement or ownership is dependent upon their profitability, and hence, their coding. FHG knowingly and intentionally coded a maximum number of procedures at the highest coding value in order to increase its compensation without regard for medical necessity or for the underlying perquisites of that coding.

157.     Not long after starting his duties at FHG, Relator discovered that FHG was coding and billing Medicare for five recently-hired FHG physicians who had not yet been credentialed or received their UPIN numbers from CMS. In order that billing for these physicians not be delayed, FHG billed their services to Medicare using the existing provider numbers of other FHG physicians.

158.     It is a basic and bright-line rule that a physician's UPIN number can only be used to bill for procedures done by that individual physician. It cannot be loaned to other doctors, even if it is expected that the other doctors will be approved by CMS and will be receiving their own UPIN numbers in the future.

159.     As the administrator responsible for overseeing these practices, Relator had all such improper claims retrieved from the fiscal intermediary, refunded and held until all of the relevant UPIN numbers had been received by the physicians in question.

160.     At a meeting with two FHG principals, Drs. Baig and Almeflehi, Relator was verbally assaulted for his corrective actions with respect to billing for the new physicians. The FHG doctors expressed concern that Relator "[wasn't] doing his job," and that they would "miss a paycheck," and Relator was told, "There is nothing more important in your job than the money."

161.     Of the CPT codes explained above, 11 are in the top 12 most frequently-used hospitalist codes. CPT codes 99231-99233, 99222-99223, 99238-99292 account for more than 75% of all coding done by hospitalists annually.

162.     In every instance of using these, and the other codes referenced herein, FHG used the lower or lowest CPT coding significantly fewer times than the average of all other hospitalists, and the higher or highest CPT coding significantly more often than the average of all other hospitalists.

163.     The differences in FHG's coding are solely due to the pecuniary motives described herein and not to any significantly higher difference in severity or acuity of the patient population served by FHG at Mary Washington Hospital, as compared with the case-mix index ("CMI") of patient populations at other medium to large sized acute care hospitals in Virginia.

164.     Virginia Health Information's Health Care Decision Support Data 2013 Industry Report shows that there are eleven (11) acute care hospitals in Virginia operating with three hundred and fifty (350) or more staffed beds, including Mary Washington Hospital, FHG's primary worksite. Mary Washington Hospital's All-Patient CMI – the weighted measure of each hospital's diagnosis population and resource consumption - is *lower* than the All Patient CMI at 7 of the 10 comparable hospitals with three hundred and fifty (350) or more staffed beds.

165.     Approximately 65% of all of FHG's services were billed to government programs, including Medicare and Medicaid. FHG knowingly and intentionally submitted upcoded or otherwise false requests and demands for payment or approval to Medicare and Medicaid.

## K.  FHG's Relationship With Mary Washington Healthcare

166.     At all times relevant to this Complaint, FHG has maintained a relationship with Mary Washington Healthcare, which operates the Mary Washington and Stafford hospitals. FHG

provides a minimum number of hospitalists to cover each 24-hour shift at both hospitals: typically 3 hospitalist physicians at Stafford Hospital and 10 hospitalist physicians and an array of mid-level providers at Mary Washington Hospital.

167.     At all times relevant to this Complaint, FHG has received monthly subsidy payments from the Mary Washington and Stafford hospitals. FHG receives these payments on top of the reimbursement it receives directly from CMS. For example, in 2010, Mary Washington Healthcare paid FHG $2,076,158 for FHG's provision of hospitalist services.

168.     From approximately 2004 through July 2010 FHG was the primary hospitalist provider serving Mary Washington Hospital.  From July 2010 through August 2013, FHG physicians continued to provide hospitalist services at Mary Washington Hospital.  Since August 2013, FGH was once again established as the primary hospitalist group serving the Mary Washington Hospital.

169.     From approximately 2004 to the present, FHG has been the primary hospitalist provider at the Stafford Hospital.

## L.  Relator's Work At FHG

170.     Immediately after starting work at FHG on August 20, 2013, Relator became aware of several practices resulting in violations of the FCA. Relator witnessed FHG's intentional practice of up-coding hospitalist billing.

171.     In the normal course of his work, Relator reviewed FHG physician compensation/income reports.

172.     As it related to his long experience in the healthcare field, Relator was familiar with national coding standards and coding levels promulgated by CMS and other experts in the field. While reviewing the FHG compensation reports, Relator immediately noticed an unusually elevated incidence of "highest" level coding.

173.     Relator's initial review of the compensation reports led to a comprehensive review the practice's coding and billing processes.  Relator's review of FHG's coding data unequivocally showed that the FHG hospitalists were uniformly using the higher or highest possible CPT codes for their work, across all hospitalist billing and coding categories.

174.     Concerned about FHG's coding and billing practices, Relator brought the matter to the direct attention of FHG's managing partners and directors on multiple occasions during August and September of 2013.  Relator discussed the FHG's coding and billing with Drs. Almeflehi, Baig, Mahmood, and Tamana on multiple occasions.

175.     On each occasion, Relator's concerns were met with indifference, condescension, or scorn. At an FHG partnership meeting on September 19, 2013, Relator again raised his billing and coding concerns to the full FHG partnership.  He was literally laughed at.  Further, the FHG Partners indicated that they had no intention of (1) following Relator's recommendation of instituting billing and coding training for the FHG doctors, mid-level providers, and non-clinical office staff (2) seeking outside expert consultants to review FHG's coding and billing practices, or (3) otherwise altering their current coding and billing practices in any way.

176.     At a meeting between Relator and several FHG physicians approximately one week after Relator's arrival at FHG, Dr. Faisal Almeflehi told the Relator, in response to the Relator's concerns about FHG's business practices, "there is nothing more important than the money we make."

177.     During a new physician orientation session being conducted by Sierra Hilliard, an FHG administrative assistant in August 2013, Relator asked one of the new doctors, Dr. Sunitha Urs, what, if any, training Dr. Urs and the other new physicians received regarding proper CPT procedural coding techniques. Dr. Urs told Relator that one of the FHG partners advised her and other new physicians to always use the higher or highest level code whenever possible and to then document the chart to justify it after selecting the billing code.

178.     By performing documentation after the fact of selecting a procedure code, and by choosing procedure codes without regard to medical necessity, FHG routinely created documents that supported their submission of false claims to the government.

179.     Relator's continued work for FHG revealed that FHG routinely, knowingly, and intentionally upcoded hospitalist billing codes wherever and whenever possible. Defendants followed this practice knowing that approximately 65% of FHG's coding and claims for payment went to government payors like Medicare and Medicaid.

180.     FHG submitted upcoded claims for payment, as described herein, to Medicare and Medicaid during the times relevant to this complaint.

181.     FHG's practice of upcoding for the billing of its hospitalist services was consistent with other FHG attempts to maximize cash flow without regard to the legality or medical necessity of their actions.

182.     Within days of joining FHG, Relator discovered that the practice was fraudulently billing for the services of the 5 new, employed, non-partner, uncredentialed providers. In order to bill for these new doctors, who began work on or about August 1, 2013, FHG billed their services as if they were performed by other existing, credentialed, FHG physicians.

183.    Not only did FHG substitute the billing information of the established FHG physicians, the physicians whose UPIN and credential information was used never touched or treated the patients for whom the medical care was billed. Had Relator not prevented it, several hundred thousands of dollars' worth more of false claims would have been submitted to the government for approval and payment.

184.    FHG's partners and directors' most notable response to Relator's corrective actions with the non-compliant billing of the new physicians' work was to express concern about the impact of the stopped claims on their paychecks and the need to refund money to Medicare, Medicaid, and other payors for those claims.

185.    On or about August 28, 2013, Relator met with managing directors/partners, Drs. Mirza Baig, Asif Mahmood and Faizal Almeflehi.  Relator expressed his concerns about FHG's lack of cash controls/balances in their financial processes and told them that he would pursue an outside healthcare accounting firm to conduct a peer review on the practice's accounting procedures and on the FHG's own accountant as well.

186.    In response, Dr. Almeflehi instead demanded that Relator engage an accountant that was a personal friend of his from Forest, Virginia.  When Relator performed a due diligence background check on the accountant, Relator learned that the accountant had been sanctioned by the Virginia Board of Accountancy for practicing as a CPA without being certified by the Board as a CPA.  Relator advised Dr. Almeflehi that this would not be an appropriate selection for the review.

187.    To date, FHG has not engaged any accountancy professionals to review any of its accounting, coding or billing procedures.

188.     Shortly after the end of August, 2013, Erin Brown, Dr. Baig and the Relator met with the practice's accountant for a monthly and year-to-date review of financials for FHG. As the recipient of monthly subsidies, FHG was required to submit its financial statements and balance sheets to Mary Washington Healthcare for review.

189.     Dr. Baig asked the accountant to go back and produce a second, different, set of reports because he did not want the hospital to know all the information in the initially-produced report. Specifically, Dr. Baig was concerned about Mary Washington Healthcare's reaction to FHG's financial reporting in the original set of documents. Dr. Baig may have been concerned that FHG's subsidy payments could be jeopardized if Mary Washington Healthcare knew the truth.

190.     During his time at FHG, Relator also learned that each FHG Partner had created her own LLC corporation in order to receive payments from FHG for overtime work performed at the Stafford Hospital. Relator expressed his concern to the Managing Partners/Directors that for tax purposes and pursuant to IRS regulations, the compensation for overtime work being done by the Partners at Stafford Hospital was no different than the regular work being done by FHG at Mary Washington Hospital and Stafford Hospital for which they were being paid as employees of FHG.

191.     Despite Relator's efforts to curb this practice, Defendants did not do so, and, upon information and belief, it continues to the present.

192.     As detailed above, FGH's improper practices extend beyond simple upcoding of E/M CPT codes. FHG overbills the government by systematically providing co-management of ICU patients, in conjunction with intensivist physicians from another practice, when FHG's services are duplicative of those provided by the intensivist or not medically necessary.

## COUNT ONE – VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1) and (a)(2)
### (AGAINST ALL DEFENDANTS)

193.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 192 of this Complaint

194.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

195.    Defendants submitted bills for payment for hospitalist physician services that were for a higher level of service than actually performed, documented, or required by medical necessity. Through these and the other acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims, records, and statements for payment or approval to the United States.

196.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government, through the Medicare, Medicaid, and other federally funded health insurance programs, to pay or approve such false or fraudulent claims.

197.    The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' fraud.

198.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

### COUNT TWO -- VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3219(a)(1)(G) – KNOWING RETENTION OF OVERPAYMENTS
### FROM THE UNITED STATES
### (AGAINST ALL DEFENDANTS)

199.    All of the preceding allegations are reincorporated by reference.

200.   Defendants knowingly submitted false claims to the United States as alleged herein, which resulted in a series of overpayments from the United States.

201.   Defendants then made multiple false claims in order to retain these overpayments.

202.   As a result of these overpayments, the United States has been damaged.

## COUNT THREE -- VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3219(a)(1)(C) -- CONSPIRACY TO SUBMITE FALSE CLAIMS TO THE UNITED STATES (AGAINST THE INDIVIDUAL DEFENDANTS)

203.   All of the preceding allegations are reincorporated by reference.

204.   The individual physician defendants reached an agreement between and among themselves to submit false claims to the United States; this agreement led to and supported the individual defendants' false claims schemes as alleged herein.

205.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT FOUR -- VIRGINIA FRAUD AGAINST TAXPAYER ACT (VA. CODE § 8.01-216.3(A)(1), (A)(2) AND (A)(7) (AGAINST ALL DEFENDANTS)

206.   Relator re-alleges and incorporates by reference the previous allegations.

207.   This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayer Act, as amended.

208.   Defendants submitted bills for payment for hospitalist physician services that were for a higher level of service than actually performed, documented, or required by medical necessity. Through these and the other acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims, records, and statements for payment or approval to the Commonwealth of Virginia.

209.     Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government, through the Virginia Medicaid system to pay or approve such false or fraudulent claims.

210.     The Commonwealth, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid but for Defendants' fraud.

211.     By reason of Defendants' acts, the Commonwealth has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself individually and acting on behalf of the United States and the Commonwealth of Virginia prays that judgment be entered against Defendants as follows:

A.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, with interest.

B.     That Relator be awarded the maximum amount available under Sections 3730(d) and 3730(c)(5) of the False Claims Act.

C.     That Relator be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d).

D.     That all relief be awarded to the Commonwealth under the Virginia Fraud Against Taxpayers Act and that the relator be awarded the maximum percentage of the Commonwealth's recovery.

E.     And, such other relief shall be granted in the favor of the United States or the Commonwealth of Virginia and the Relator as this Court deems just and proper.

Relator hereby demands a jury trial.

RELATOR, by and through his Counsel:

BY: _____

Stephen E. Baril, Esq. (VSB# 19604)
Kaplan Voekler Cunningham & Frank PLC
1401 East Cary Street
Richmond, Virginia 23224
Telephone:   (804) 823-4000
Facsimile:   (804) 823-4099
Email:       sbaril@kv-legal.com

Zachary A. Kitts, Esq. (VSB#47052 )
K&G Law Group PLLC
3554 Chain Bridge Road
Suite 400
Fairfax, Virginia 22030
Telephone:   (703) 649-5500
Facsimile:   (703) 649-6363
Email:       zkitts@kglawpllc.com

Michael A. Lesser, Esq.
(NOT ADMITTED IN VIRGINIA)
Thornton & Naumes LLP
100 Summer Street
30th Floor
Boston, Massachusetts 02110
Telephone:   (617) 720-1333
Facsimile:   (617) 720-2445
Email:       mlesser@tenlaw.com